WILLIAM FRANK SHELTON, III, an infant, by EDITH SHELTON, His Guardian, and FRANK JOSEPH SHELTON and MIRIAM CLAIRE SHELTON, Infants, by RUSH SMITH, Their Next Friend, Appellants, v. HAL H. McHANEY, LEE SHELTON, A. J. LANGDON, JR., Executors and Trustees of the Estate of WILLIAM FRANK SHELTON, JR., and RUBY SHELTON.—92 S. W. (2d) 173.

Division Two, March 21, 1936.

*Wayne Ely, Tom Ely, Jr.,* and *Lyon Anderson* for appellants; *Langdon Jones, Geo. Smith, D. M. Tesreau,* and *Leahy, Saunders & Walther,* of counsel.

752

*Orville Zimmerman* and *Ward & Reeves* for respondents.

COOLEY, C.—This is an action brought to contest the will of William Frank Shelton, Jr., who died December 22, 1929, leaving surviving him three minor children, plaintiffs, and a widow, Ruby Shelton, who, having refused to join as plaintiff, was named as a nominal defendant. It is agreed that Ruby Shelton, though named as a defendant, joined in the trial with the plaintiffs and is to be treated as, in effect, a contestant of the will. She, however, did not appeal from the judgment. The cause was tried to a jury, resulting in a verdict sustaining the will. From judgment thereon the plaintiffs have appealed.

Testator was fifty-nine years old at the time of his death. He had been twice married. Of the first marriage there was born one son, William Frank Shelton, III, born December 27, 1912. Testator was divorced from his first wife, Edith, in November, 1923, and in May, 1926, he married his second wife, Ruby, who survived him. Of the latter marriage two children were born, Frank Joseph, born January 12, 1927, and Miriam Claire, born August 12, 1929. The three above-named children are his only heirs and are the plaintiffs and appellants herein.

Testator had always been an active and able business man. He resided at Kennett, Missouri, where for many years he had engaged successfully in banking and mercantile business and other business enterprises, and he had accumulated a fortune estimated to amount, at the time of his death, to $700,000 or $750,000. He was president and the active manager of a bank at Kennett. He had large real estate holdings, most of which were owned by him as tenant in common with his brother Lee or, in some instances, with other persons. He and Lee were also associated in other business interests. Generally speaking, his business interests and property holdings were somewhat varied and quite extensive and to a very considerable extent in association with his brother Lee, who was several years younger.

The will in controversy was executed September 20, 1929, while testator was confined to his bed in St. Luke's Hospital in St. Louis. He died there the following December 22nd. By said will the testator gave to his son William an automobile and certain articles of jewelry, to Ruby Shelton his residence property at Kennett and an automobile, and bequeathed and devised the remainder of his estate to his brother Lee Shelton, Hal H. McHaney and A. J. Langdon (defendants herein), for the use and benefit of his said wife and children. No bequest or devise is made to any of the persons named as trustees. The same three persons named as trustees are named as executors, and the will provides that they may serve in both

capacities without bond. By the terms of the will the trustees are directed, within five years after testator's death, to work out a "division" of the properties and interests which testator and Lee held together and during said period such part of the net income of the estate and such part of the principal as in the discretion of the trustees may be necessary or advisable is to be used for the "support, maintenance, education and care" of the beneficiaries. At the end of such five-year period the trustees are directed to divide the estate into four parts, "equal in amount and value," and to deliver one part to Ruby Shelton as her absolute property. The trustees are to continue to hold and manage the remaining three parts for the children, one part for each, until said children respectively reach the age of thirty years. The trustees are given broad powers and charged with responsible duties with respect to the care and management of the estate, the sale of property and reinvestment of funds, etc., and it is provided in the will that they are to receive for their services as trustees *reasonable compensation, not to exceed* in the aggregate, for all of said trustees, in any one year, ten per cent of the *net income* from the trust estate for such year.

Plaintiffs in their petition assail the validity of the will on three grounds, viz., first, that at the time of its execution testator was of unsound mind and therefore incapable of making a will; second, that he was unduly influenced by defendant Hal H. McHaney, his attorney, who wrote the will and who is therein named as one of the executors and trustees; and, third, that he was induced to execute the will by false and fraudulent representations made to him by said McHaney. The issues of lack of testamentary capacity and undue influence were submitted to the jury by instructions which, with one exception to be hereinafter noted, are not now criticized, and were decided adversely to plaintiffs. At the close of the evidence the court, by a peremptory instruction, withdrew from consideration of the jury the issue of fraud in procuring the execution of the will, holding that there was no evidence of fraud. That ruling is the basis of the chief complaint urged on this appeal.

The petition sets forth numerous specifications of alleged fraud on the part of McHaney, which may be summarized as follows:

(1) That he falsely and fraudulently represented to testator that it would be improper and unwise to provide in the will that the two younger children, Frank Joseph and Miriam Claire, should come into possession of their respective shares when they respectively reached the age of twenty-one years, as testator desired and had intended to do; that it would be unwise and unfair to discriminate between those two children and William by keeping William's share in trust until he was thirty years old and giving the other two their shares at the age of twenty-one; and that he "unduly influenced

and persuaded'' testator to leave the shares of said two younger children in trust until they respectively reached the age of thirty years.

(2) That testator desired and intended to name his wife, Ruby, as one of the trustees and that McHaney falsely and fraudulently represented to him that his said wife could not legally act as trustee until after the distribution to her of her share of the estate and that after such distribution she would, under the terms of the will, ''become a trustee of the trust estates'' of her children, said Frank Joseph and Miriam Claire.

(3) That he falsely and fraudulently represented to testator that under the terms of the will the combined fees and commissions of the trustees, acting both as trustees and executors, would not and could not in any one year exceed ten per cent of the net income from the estate during that year.

(4) That, intending to defraud the testator and his beneficiaries, he falsely and fraudulently ''requested, persuaded and unduly influenced'' testator to appoint him as one of the executors and trustees.

(5) That he fraudulently persuaded testator to entrust to him the preparation of the will by representing to him that the cost of having the will written by Charles M. Rice, the attorney of testator's choice, would be exorbitant and unreasonable and that it was unnecessary to employ Rice or any attorney other than himself.

(6) That he falsely and fraudulently represented to testator that he had consulted and advised with ''other lawyers'' concerning all the terms of the will.

(7) That he ''falsely and fraudulently'' failed and refused to read the will to testator before, at the time of or after its execution.

(8) That he falsely and fraudulently advised Ruby Shelton and the persons who were present to attest the will that it was unlawful and improper for them to remain in the room while the will was being read to or by testator.

(9) That he ''falsely and fraudulently'' failed and refused to leave the will or a copy thereof with testator or to make same or a copy thereof ''available to him'' before or after its execution.

(10) That he intended to defraud testator and his beneficiaries by falsely and fraudulently charging and collecting from the estate after testator's death certain named sums for stenographic services, attorney fees and executors' fees.

The record is voluminous, containing nearly two thousand pages. Much of the evidence relates to the issue of testamentary capacity. Since appellants are not now urging that such issue was not properly determined against them we need not notice that evidence, except to indicate its nature in a general way for the better understanding

of the contentions relating to fraud in the procurement of the will. It is conceded that testator had always been a man of strong will power and decisive character as well as of clear, keen mind and good business ability. The malady of which he died is called multiple myeloma, a rare but fatal disease, for which medical science seems to know no cure. Its approach is insidious, and its progress rather slow and gradual. In 1928 testator had felt some pains, which later were attributed to the disease but which at the time caused him only temporary inconvenience and did not affect his business activity. About July, 1929, an unusual physical exertion caused him a severe pain in his back. He at first thought he was suffering from lumbago. His condition became worse and on September 5th he was taken to a hospital at Memphis, Tennessee, where he remained about five days. He was there examined, his malady diagnosed as multiple myeloma, and he was informed that the disease was a fatal one and that he probably would not live more than about three months. He was taken back to Kennett and on September 14th started in an ambulance to St. Louis, arriving on the fifteenth and going to St. Luke's Hospital, where he remained until his death.

There was some expert testimony to the effect that the disease had affected testator's mind before his will was executed. Most of the medical testimony was to the contrary and that said disease does not affect the mind until in the last stage, which stage had not been reached at the time the will was written. There was also much evidence from lay witnesses as to testator's mental condition, and a great many letters were introduced which had been written by testator while in the hospital, from the time he went there until three weeks or so before his death, directing the affairs of his bank and other business matters. Of all this evidence it is sufficient to say that by far the greater weight of it is to the effect that when he executed his will testator's mind was unimpaired.

We come now to the evidence offered in support of the charges of fraud. It appears without dispute that before his second marriage testator had made a will by which he placed the property left to his son William in trust. He had in mind making a new will, dividing his property equally among his wife and children and placing it all in trust, such trust to continue as to his wife's share for five years, to allow time for the settlement of the estate in the probate court, payment of inheritance taxes, etc., and for the trustees to segregate his interests from others with which they were associated and get the estate in such shape that his wife's share could more practicably be turned over to her, and as to the children to continue until they reached an age and discretion such that in his judgment their shares might safely be entrusted to them. He all along intended to continue the trust for William until the latter

reached the age of thirty years. He at first intended to terminate the trust for the other two children when they respectively reached the age of twenty-one years.

Mr. McHaney for several years had been testator's attorney, and when testator returned from Memphis and before going to St. Louis he called McHaney and requested him to prepare the proposed will. They spent considerable time together that day and had another conference the next day. Testator was about to leave Kennett for St. Louis and requested McHaney to come there to complete the work of preparing the will. McHaney did so and saw and conferred with testator on the 17th, 18th, 19th and 20th of September, during which time he was working on the preparation of the will and matters connected therewith.

Plaintiffs called as their witnesses McHaney and Ruby Shelton. Their case, on the issue of fraud, rests substantially on the testimony of those two witnesses. Both were examined and cross-examined at considerable length.

McHaney testified that at his first conference with testator at Kennett he spent an hour or so with testator discussing the provisions which the latter desired to make in his will and then began preparing a draft thereof. Testator did not then say whom he wanted as trustees.

From the testimony of Lee Shelton, defendant's witness, it appears that before McHaney had been called testator had decided upon Lee Shelton and Langdon, if the latter would act, but was in doubt as to the third trustee; that he had in mind a Mr. Bissell but concluded that it would be impracticable to appoint Bissell because the latter lived at St. Louis, too far away; that Lee then suggested McHaney, which suggestion testator thought a good one. McHaney testified that when he called upon testator the next day at Kennett testator asked him if he would act as a trustee, to which he consented; that he never at any time suggested the appointment of himself. He said that he then told testator that inasmuch as he was to be named as trustee he thought it would be best for testator to employ someone else to write the will in order to avoid any possible contention of undue influence. It appears from McHaney's testimoney that testator at first dismissed as ridiculous the thought that anyone might raise the question of undue influence on that ground, but that at McHaney's continued insistence that either some other lawyer should write the will, or at least be employed to check and go over it with testator, the latter consented to have some other lawyer check it and go over it with him, which was done. McHaney saw testator on the morning of September 16th, but at that time the latter said he was too busy with the doctors to discuss the will, and McHaney spent the day making a rough draft which he took to the hospital next morning and discussed with testator. He saw and con-

ferred with testator on each of the three following days—September 17th, 18th and 19th,—having with him on each occasion a tentative draft of the will. There were at least two or three such tentative drafts examined and discussed. On most if not all of these occasions Ruby Shelton was present. In the first tentative draft there was nothing said about compensation of the trustees and McHaney suggested to testator that there should be some limitation on the amount that could be paid to them. Testator thought well of the suggestion and asked McHaney what he thought the limitation should be, to which McHaney replied that since he was being named as a trustee he was not in a position to make any suggestions as to their compensation and that testator himself, without suggestion from him, directed him to put it at ten per cent of the income. There was at no time any mention of executors' fees, nor does it appear from Mrs. Shelton's testimony that executors' fees were ever mentioned. She testified that at one time she asked testator ''If he didn't think the administration under this will would be rather expensive'' to which he replied, ''Well, no, the only cost will be ten per cent of the net income and the law provides that anyway.'' She testified that that conversation occurred before the will was executed. In a deposition she had testified that it occurred after the will had been executed.

McHaney testified that when he called upon testator with a rough draft of the will on Tuesday the 17th he again advised testator that it would be advisable to either employ another attorney to draft the will or to check it and testator consented that he might ascertain what some St. Louis lawyer would charge for the service, and that that night he saw his brother, an attorney in the employ of Igoe, Carroll, Higgs & Keefe, and asked him which one of the firm would be the best man to draft the will, and that his brother recommended Mr. Keefe; that he, McHaney, later was informed that Mr. Keefe would charge $1500 to draft the will or $500 to check one already drawn. (Keefe was not a witness in this case.) McHaney so reported to testator who thought the charge too high and then suggested that he had been thinking the matter over and believed that he could have his friend Mr. Ed Harmon get a will prepared for him without cost by some attorney in the First National Bank, of which Harmon was vice president, and with which bank testator had had business dealings. McHaney was directed to see Harmon and have the latter introduce him to some lawyer. Harmon did introduce him to Mr. Rice, a member of the firm of Lewis & Rice, with whom he conferred.

Going back a little it appears that on Wednesday the 18th the question of Ruby Shelton acting as trustee was first mentioned. Relative to this McHaney testified:

''On Wednesday I had a will drafted in longhand and read it

over to Mr. Frank in Mrs. Shelton's presence, and my remembrance is it was at that time that Mr. Frank said that 'Ruby wants to know if she can be a trustee; is there any legal objection to her being a trustee?' My remembrance is I told him I'd hesitate to give him a definite answer without some investigation. It occurred to me offhand that there might be some legal question about her being a trustee, inasmuch as she was to be one of the beneficiaries of this trust,, and I told him I would investigate.''

Relative to this incident Mrs. Shelton testified that McHaney on that occasion had with him notes of what was to be in the proposed will which he read over to testator and that testator, after some meditation, asked her if there was anything else she could think of, to which she replied that she was not concerned about William's part of the estate ''But I would like to have a hand in the administration of my children's part of the estate.'' She said:

''And Mr. Shelton replied: 'Well, that is all right, but Hal thinks for the first five years, being a beneficiary under the trust—it might invalidate the will, because for the first five years, being a beneficiary under the will, you couldn't also be a trustee,' and Mr. McHaney spoke up and said: 'You see, it is like this, it is like the party of the second part in a deed of trust being one of the other parties also, which would void the deed of trust,' and he also said, Mr. Shelton spoke up and said: 'That is, he can't find a Missouri precedent on it.' ''

It appears that testator directed McHaney to ask Mr. Rice what his charges would be and if, in his opinion, Mrs. Shelton could serve as trustee. McHaney saw Rice on the morning of the 19th. He did not have with him a copy of the proposed will but explained to Rice the contemplated provisions thereof and he testified that Rice told him he would charge $1500 to draft the will or $250 to check over one written by McHaney and that he so reported to testator; that testator considered the charges too high. He testified that in his talk with Rice the latter suggested that there should be some provision giving the respective beneficiaries the right to provide for surviving husbands or wives in case of their death, which suggestion he reported to testator and which provision was subsequently made in the will; that Mr. Rice also suggested that it would be more advisable to continue the trusts as to all of the children until they respectively became thirty years of age; that he, Rice, did not think it advisable to ''show a preference between the children by tying up one share to a certain age and the others for a lesser period.''

McHaney testified that he forgot to ask Rice if Mrs. Shelton could serve as trustee and Rice had said nothing about that; that he saw testator again that day and reported to him what Rice had said, telling him of Rice's suggestions above mentioned; that Mrs. Shel-

ton was present and testator asked her what she thought about the suggested changes, that is postponing the termination of the trust as to all of the children to the same age and giving the beneficiaries the right to make certain provisions for surviving spouses in case of their death before the termination of the trusts, and that Mrs. Shelton said it would be all right. Relative to employing Rice, McHaney said testator considered his charge too high and asked him if he could not find some lawyer who would check the will for a reasonable amount; that he told testator he knew a Mr. Clerk, a Harvard graduate, and a friend of his brother, who he thought would do it for a satisfactory fee, and testator told him to see Clerk, which he later did and arranged with Clerk to come to the hospital and go over the completed draft of the will with testator.

Relative to the appointment of Ruby Shelton as trustee McHaney testified that, as above stated, he had forgotten to ask Rice his opinion and so reported to testator and then suggested that he would make a more thorough investigation "and see if we can decide the question to a certainty," to which testator replied, "No, that is not necessary. I have heard enough to know there is some question about Ruby being a trustee. I don't want anything in this will that there will be any probability of a question about it, because I don't want it attacked."

Relative to this conference Mrs. Shelton testified substantially as did McHaney. She said that when McHaney reported to testator the changes Mr. Rice had suggested and that the trusts should terminate as to all of the children at the same age "Mr. Shelton lay there awhile and he turned toward me and said, 'What do you think about it?' I replied, 'Well, maybe that is all right,' and he lay there awhile longer and he turned and he says, 'I guess that is all right;' " that when McHaney told testator he had forgotten to ask Rice if she could serve as trustee and that he would look it up further if testator wanted him to testator said, "No, let it go. It is not that important." She made no protest.

The will was again rewritten embodying the changes which on Thursday had been discussed between McHaney and testator in the presence of Mrs. Shelton and when it was ready for execution on Friday evening McHaney took Mr. Clerk to the hospital where Clerk and testator examined and discussed it for an hour and a half or two hours. Clerk testified that he read it over to testator carefully, first in full and then paragraph by paragraph, and explained it fully to testator, who, at the close of the discussion, said it was what he wanted. Only the two were present in the room during that discussion. There is some suggestion in the testimony that Mr. Clerk suggested that other persons retire from the room and there is other testimony that they all of their own initiative excused themselves. It is clear from all the testimony that McHaney voluntarily remained

out of the room and that he did not suggest that anyone leave the room.

After the will was executed it was handed to McHaney by the testator with the request that he give it to Joe Wellman, testator's secretary and an employee in his bank, with directions to put it in testator's box in the bank. That was done.

There is no testimony that testator ever said that he wanted his wife to be one of the trustees. His statement was that she wanted to be a trustee and it appears that he was willing to accede to her wish if satisfied that there was no legal impediment.

It is clear from Mrs. Shelton's testimony, as well as that of McHaney, that during the time the will was in course of preparation she was freely consulted by testator as to its proposed provisions, asked for suggestions, was present at most if not all of the conferences between testator and McHaney and was fully cognizant of the provisions of the will when it was finally completed. Testator told her that he wanted it to be satisfactory to her. He told her before they went to St. Louis that he intended to appoint as trustees the three persons whom he later did appoint and explained to her why he did not make her sole trustee. She expressed herself as satisfied with the will as written if it suited Mr. Shelton.

Mr. Rice was not called as a witness at the trial but his deposition had been taken by defendant trustees and was introduced in evidence by plaintiffs. His testimony is rather negative. The deposition was taken two years or more after his conference with McHaney. He recalled having been consulted by McHaney but could remember very little of what he had said to the latter. He did not recall having told McHaney what he would charge for writing or checking the will but would not say that he had not done so. Also he said he did not remember whether or not he had suggested that it would be better to make no differentiation among the children as to the age at which the respective trusts should terminate but that he might have done so. Without setting out at length a *resume* of his testimony it may be said that he did not deny having made to McHaney the statements and recommendations which the latter testified he had made and which he, McHaney, reported to the testator. Rice testified, however, that he recalled that McHaney had told him that he had advised Mr. Shelton to get some lawyer other than himself to write the will "or check it, revise it in any way that was necessary."

In an effort to prove "a scheme to defraud" and an intent on the part of McHaney to "substitute his will for that of the testator for the purpose of enriching himself at the expense of testator's widow and small children," plaintiffs offered to show certain acts of McHaney subsequent to testator's death. The court, in the absence of the jury, permitted plaintiffs to interrogate McHaney as to these

matters for the purpose of determining the admissibility of the proffered evidence. Such hearing developed the following:—One item was $600 for stenographic services rendered to the estate during the progress of the administration in the probate court, covering a period of about fourteen months. The item had been allowed by the probate court, with the knowledge and consent of the other executors, in the final settlement in that court. McHaney said that after the beginning of the administration he had increased his stenographer's salary $15 per month, which for the fourteen months would aggregate $210, and admitted that he had retained the balance of the $600. But he claimed the $600 was only reasonable compensation for the girl's time and services, practically all of which (as well as his own) had been devoted to the affairs of the estate.

Another item was a fee which he had proposed to charge for services as attorney during the administration period. No other attorney had been employed and he had acted as attorney for the estate. An exhibit showing a list of the legal services rendered was offered. This had been shown to three competent and reputable attorneys, each of whom had expressed the opinion that the services listed were reasonably worth $5000. There is no showing to the contrary. McHaney said that while he knew a sole executor could not hire himself as attorney and pay himself an attorney fee, he thought the other executors could hire him and pay him out of the estate. Ruby Shelton had protested against this proposed charge and it was not allowed nor claimed against the estate in the settlement. Instead, at the suggestion of the other executors, McHaney was allowed and paid a fee of $3000 by the Shelton Store Company, a large corporation of which the testator's estate owned three-fourths of the stock (Lee Shelton owning the other fourth), for services as attorney and secretary, in which capacities McHaney had acted for the store company during said fourteen month period. It is not claimed that the services rendered the store company were not reasonably worth the amount so paid.

Another offer of proof was that McHaney, as attorney for the executors, had inserted an item of $10,000 for attorney fees in reporting the amount and value of testator's holdings in Arkansas for inheritance tax purposes, appellants contending that McHaney had intended to charge that fee himself. McHaney said that there was a place in the printed form for such report for estimated attorney fees, deductible in computing the taxable value of the estate, and that the $10,000 item referred to was merely an estimated possible expense, but that he had neither expected nor attempted to charge or receive any part of it himself. There was no offer of evidence to contradict that explanation.

Plaintiffs further offered to prove that the trustees had refused to make William Shelton an allowance for his support and education. The facts concerning this matter, as developed at the hearing before the court, were these: William was a student in the University of California. His mother, Edith, was his guardian. She, as such guardian, had received for him, shortly after testator's death, $10,000 from an insurance policy which testator had taken out in William's favor and $750 from the sale of the automobile which testator had left to William. Out of that money she was giving William an allowance of $500 a month. The trustees declined to pay him an allowance out of testator's estate while he was thus receiving,—and spending—said $500 a month, deeming that sum amply sufficient for his needs. They offered that if said insurance money was put in a trust for William so that it would be preserved for him they would make him a suitable allowance out of the estate.

The court, after said hearing in the absence of the jury, sustained defendant trustees' objections to said proffered evidence and refused to let it go to the jury.

I. It is conceded by the parties that fraud may be asserted as an independent ground for contesting a will. It is the sole ground now relied upon by appellants, the other grounds originally urged having been eliminated by the finding of the jury. That as a general rule fraud will not be presumed but must be proved *as charged* by the party asserting it is too well established to require citation of authorities. Appellants contend that a confidential relation existed between testator and McHaney and that, as the latter was named an executor and trustee, he thereby received benefits under the will and that such facts raise a presumption of fraud and of undue influence, casting upon the proponents of the will the burden of proof to overcome such presumption; wherefore, they argue, they were entitled to go to the jury on the issue of fraud even though it be held that they produced no evidence to prove the fraud charged. This contention cannot be sustained.

Both sides have briefed this question on the theory that the facts which would raise a presumption of undue influence and shift the burden of proof on that issue would operate similarly where the question is one of alleged fraud in the procurement of the will. Without deciding whether or not there is or should be a distinction, we may, for the purpose of the case, proceed upon that theory. It is not contended that a presumption of fraud, shifting the burden of proof, could be indulged if a like presumption would not arise as to undue influence. Nor need we consider the modification of the rule as to said presumption of undue influence, as announced in some of the earlier cases, that was made by this court en banc in the recent cases of Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772, and Pulitzer v. Chapman, 337 Mo. 298, 85 S. W. (2d) 400, because in

this case an essential fact element, recognized by all the cases as necessary in order that the presumption may be indulged so as to shift the burden of proof, is lacking. McHaney is not a beneficiary under the will, within the meaning of the rule relative to said presumption,—or perhaps we should say, more accurately, relative to the exception to the general rule that the burden of proving undue influence or fraud rests upon him who asserts it.

This precise question was decided by this court, adversely to appellants' contention, in Ryan v. Rutledge, 187 S. W. 877. In that case as in this a large estate was involved and by the will there in controversy it was placed in trust. One Rutledge was named executor and trustee, without bond, and by the terms of the will was given broad powers. It was claimed that the testator was feeble in mind when the will was written and had executed it under the undue influence of Rutledge, who fraudulently procured its execution in order to obtain the benefits that would result to him as executor and trustee. He received no bequest or devise under the will. A fiduciary relation between him and the testator was shown and in deciding the case this court assumed the existence of such relation.

The court said that if the will simply provided a scheme for the enrichment of Rutledge ''or made him devisee or legatee'' the presumption of undue influence would arise and the plaintiff would be entitled to have that issue submitted to a jury ''where the laboring oar would be put upon the proponents of the will,'' and then said, 187 S. W. l. c. 878:

''But, under this will, nothing was devised or bequeathed to the fiduciary. All the possible advantages which could inure to him from its execution were the legitimate compensations of executor and trustee. Every testator who disposes of his property in a manner requiring the services of an executor and of a trustee in order to effectuate his intentions must of necessity appoint one or more functionaries to discharge those duties, and the law fixes the compensation that shall be paid. Neither office is one giving an unrestricted right to plunder or pillage the estate, and, if such practices are resorted to, ample redress will be afforded by the courts when their aid is invoked by the parties affected. It cannot, therefore, be held that the appointment of a fiduciary to discharge the duties of executor and trustee gives him any advantage which would not be reaped by a stranger if so designated by the testator. This exact point was disposed of by the Supreme Court of Connecticut in the following language (Livingston's Appeal, 63 Conn. l. c. 78, 26 Atl. 470).''

The court then quoted from the Livingston case, cited Linton's Appeal, 104 Pa. 228, and added:

''Under this correct statement of the rule, it is clear to a demonstration that the appointment of Robert Rutledge under the present

will has not affected, in law, the rights of the devisees and beneficiaries thereunder in any manner which would not have happened had another individual or trust company been delegated to perform the same duties.''

The court held that the case did not fall within the rule casting upon the proponents of the will the burden of proving the absence of undue influence and that the burden of proving undue influence "continued to rest on the plaintiff.'' The Ryan case is in point here. It was cited with approval on this point in Wentura v. Kinnerk, 319 Mo. 1068, 1078, 5 S. W. (2d) 66. [See, also, Lane v. St. Denis Catholic Church (Mo. App.), 274 S. W. 1103.]

That a person receiving no bequest or devise under a will is not made a beneficiary within the meaning of the rule we are discussing by being named therein as executor and trustee and receiving the emoluments of those offices. [See, also, Pond v. Hollett, 310 Ill. 31, 141 N. E. 403; Williams v. Ragland, 307 Ill. 386, 138 N. E. 599; Breadheft v. Cleveland, 184 Ind. 130, 108 N. E. 5; In Re Estate of Kilborn, 162 Cal. 4, 120 Pac. 762; 1 Page on Wills (2 Ed.), sec. 734, p. 1253.] We hold that in this case the burden of proof on the issue of fraud remained with the plaintiffs.

II. In our opinion there was no evidence to sustain the allegations of fraud and the circuit court did not err in refusing to submit that issue to the jury. In their brief appellants stress mainly the specifications which we have designated as 1 and 2, viz., McHaney's alleged false representations inducing testator to prolong the trust for the two younger children till they reached the age of thirty years, and his alleged false representation that Ruby Shelton could not act as trustee.

Of the first:—The evidence clearly does not sustain this charge. Testator had all along intended to place the shares of those two children in trust until they reached the respective ages of at least twenty-one years, and William's share until he was thirty. This is not disputed. All McHaney did was to report to testator Rice's suggestion that it would be better to have the trust terminate as to all three children at the same age. There is no evidence that McHaney was not telling the truth when he so reported to testator. He made no suggestion as to that matter himself. Testator, after consulting with his wife, the mother of said two younger children, who thought the suggestion all right, concluded to and did adopt it. Clearly, under the evidence, that change in testator's original intent was not brought about by fraudulent representations on McHaney's part.

Of the second:—As we have stated, testator's original intention was to appoint as trustees the three persons whom, ultimately, he did appoint. He had determined upon those three while at Kennett,

before leaving for St. Louis, and he so told his wife, Ruby. Later, and at the suggestion of his wife, the question of making her one of the trustees came up. It may be observed that there is nothing in the evidence to show that, had she been appointed, she would have supplanted McHaney rather than Langdon. It may be inferred from the evidence that she would not have supplanted Lee Shelton. In this situation McHaney was asked if there was any legal impediment to Ruby Shelton serving as a trustee. He did not tell testator that she could not legally serve, nor did he express to testator a positive opinion that she could not. He merely indicated that he had some doubt on the question and offered to investigate and see if a definite precedent could be found, particularly a Missouri precedent. Before he had completed the investigation and while suggesting to testator that he would look further, testator told him, as McHaney testified, not to do so, that he had heard enough to know there might be some question about it and he wanted nothing in the will about which there might be a question; or, as Mrs. Shelton testified, ''No, let it go. It is not that important.''

Appellants argue that McHaney's statement to testator to the effect that he had some doubt as to Ruby Shelton's eligibility to act as trustee before she came into possession of her share of the estate was obviously false because ''There are many precedents in this State, which McHaney could have found, that recognize the right of a testator to name the same person both as a beneficiary and trustee of a testamentary trust,'' and they cite the following: Bixby v. St. Louis Union Trust Co., 323 Mo. 1014, 22 S. W. (2d) 813; Rose v. McHose's Executors, 26 Mo. 590; Owens v. Ellis, 64 Mo. 77; Hook v. Dyer, 47 Mo. 214; Murphy v. Carlin, 113 Mo. 112, 20 S. W. 786; Marshall v. Meyers, 96 Mo. App. 643, 70 S. W. 927; Foote v. Sanders, 72 Mo. 616; Turney v. Sparks, 88 Mo. App. 363; and Cook v. Couch, 100 Mo. 29, 13 S. W. 80.

We have examined those cases. Bixby v. St. Louis Union Trust Company had not been decided when this will was·written. Of the other cases it may be said that while some of them appear to recognize, *sub silentio,* that a person who takes, under a will, a beneficial interest in property may also act as trustee or cotrustee, holding the legal title for the purposes of the trust, the question of authority so to act and the possible effect as to merger of estates or interests by giving to the same person as trustee the legal estate and as beneficiary a beneficial interest or equitable estate in the same property was not raised, and did not have to be, and was not expressly, decided. Appellants have not cited and, we may assume, have not been able to find, a case in which such question was raised and expressly decided. The question was not raised nor expressly decided in the Bixby case.

We deem it unnecessary to discuss the authorities cited by respondents (Robinson v. Crutcher, 277 Mo. 1, 209 S. W. 104, 105; In Re Fox's Estate (Pa.), 107 Atl. 863; 1 Bogert's Trusts and Trustees, sec. 129, p. 382 et seq.), which, they claim, indicate that it is questionable "whether or not there would not be a merger in an equitable and legal title by permitting one of the beneficiaries to be a trustee." Conceding, for the purpose of the case, that Ruby Shelton could legally have been appointed and could have acted as cotrustee (and we do not mean to be understood as intimating the contrary in the situation here shown), and conceding further, for the purpose of this case, that, as appellants contend, if McHaney *falsely and fraudulently* represented to testator that in his opinion she could not so act, and thereby induced the testator to make his will as he would not otherwise have made it, such misrepresentation would constitute a fraud, we find nothing in the evidence that would justify a finding that McHaney falsely made such representation. If he entertained a doubt on the question, even though a mistaken one, and honestly so stated to testator when the latter inquired about that matter, we apprehend it will not be contended that he was guilty of *willful and fraudulent misrepresentation,*—and that is what plaintiffs charged and had the burden to prove. In our opinion they failed to produce any substantial evidence to support such charge.

Appellants say in their brief that McHenry falsely represented to testator that the combined fees of executors and trustees could not under the will exceed in any one year ten per cent of the income for that year. There is no evidence that executors' fees were ever mentioned. They also assert that McHaney fraudulently requested and persuaded testator to appoint him a trustee and to entrust to him the preparation of the will, and falsely represented that Rice's charge for writing the will would be exorbitant and unreasonable. We find no evidence in the record tending to support those charges of fraud.

Other specifications of fraud charged in the petition seem to have been abandoned. In any event there is no evidence tending to prove them.

III. We think the court properly excluded the evidence offered by plaintiffs as to charges against the estate made or attempted to be made by McHaney in the course of the administration in the probate court and in the final settlement there. Those were matters which occurred long after the will was written. Acts and conduct of a party charged with fraud, occurring subsequent to the alleged fraudulent acts upon which the charge of fraud is based, may be admissible in evidence if they tend to characterize and throw light upon the fraudulent acts charged. We do not think the excluded evidence could have such effect here. McHaney is charged with

having made false representations to testator, thereby inducing him to make the will in question. We have held that there is no evidence from which it could be found that he made such false representations. Any secret intention he may have had to subsequently overcharge the estate for his services could not have influenced testator in making the will. (We do not mean to intimate that he had such intent.) Moreover, as McHaney of course knew, charges against the estate by the executors and trustees would have to pass the scrutiny of the courts, and for maladministration of the trust the trustees would be subject to removal. In the circumstances shown we cannot perceive that the excluded evidence could have had any legitimate bearing on the issue of fraud presented.

The evidence offered to show that the trustees refused to make William Shelton an allowance out of the estate while he was receiving an allowance of $500 a month from his guardian was likewise properly excluded. The trustees were, by the will, vested with discretion in that matter and it was their duty to exercise it conscientiously and according to their best judgment. They evidently thought that $500 a month was enough for the young man to spend, and that it would be better to conserve for him his portion of the income from the estate. Such action in no way tends to show fraud in the procurement of the will.

IV. Complaint is made of Instruction No. 1 given on behalf of proponents. That instruction stated the three grounds on which the validity of the will was challenged and told the jury that plaintiffs had failed to establish fraud on the part of McHaney and that the jury could not find against the defendant trustees on that ground and that "in your deliberations and consideration of this case you will disregard any and all charges and statements in regard to fraud on the part of the defendant Hal H. McHaney; but you will confine your deliberations in this case solely to the question of whether William Frank Shelton, Jr.. was mentally capable of making the will in question at the time of the execution thereof as set out and defined in other instructions in this case, and the question of undue influence as set out in other instructions." Appellants say that the direction to "disregard any and all charges and statements in regard to fraud" on the part of McHaney precluded the jury from considering "such evidence of fraud as was presented" in determining the question of undue influence.

We have held that there was no evidence of fraud presented. The trial court so held and so instructed the jury. The court could not consistently have told the jury or permitted them to believe that they could consider evidence of fraud in determining the issue of undue influence while, at the same time, ruling,—correctly—that there was no evidence of fraud. The instruction does not purport

to withdraw any *testimony* or *evidence*. It refers to "*charges* and *statements*" of fraud. The petition, containing many charges of fraud, had been read to the jury. The opening statement to the jury, made by plaintiffs' counsel, is not preserved in the record, but it is safe to assume that it contained statements of alleged fraud on the part of McHaney. Such contention, of course, was urged in the trial. The criticized portion of the instruction doubtless had reference to such charges and statements. In an instruction given for plaintiffs the court told the jury that in determining whether undue influence had been used to procure the execution of the will they should take into consideration the testator's physical and mental condition at the time of its execution, his statements during its preparation and at the time of its execution, the will itself and its provisions, "and all other facts and circumstances in evidence in this case." That instruction and defendant trustees' Instruction No. 1 are not in conflict, and when all the instructions are read together, as they should be, we are satisfied that the jury was not misled by said Instruction No. 1.

Testator was a man of strong mind and character, an experienced and able business man, a man not easily influenced to act against his judgment or to abandon a purpose he had determined upon. The great weight of the evidence is to the effect that, when he executed his will, he was in full possession of his mental faculties. It is virtually conceded, and under all the evidence cannot be doubted, that before he called McHaney to write his will he had definitely determined to divide his estate among the natural objects of his bounty in proportions as he ultimately did do,—a fair and equitable division,— and to place the shares going to his children in trust. He had determined upon the persons he meant to appoint and subsequently did appoint as trustees. The complaints made of the will in question go rather to matters pertaining to the administration of the trust created thereby than to the disposing provisions of the will itself. If there should be maladministration or breach of trust on the part of the trustees it is within the power of the courts to grant relief without destroying the will. On the record presented the verdict and judgment appear to us to be clearly for the right parties and we find no prejudicial error in the record. The judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.